Mallory *v.* Leach.

---

CYNTHIA S. MALLORY *v.* BERIAH N. LEACH.

*Variance. Pleading. Evidence. Fraud. Contract.*

In an action on the case by the seller of property for fraudulent representations· and concealment by the purchaser in regard to its value, the price paid was set forth in the declaration less than it was proved on trial to have actually been. *Held* to be no variance.

The defendant sold the plaintiff certain stock, and executed to her at the time a written contract that he would repurchase it, if she desired, after a certain time at a stipulated price, and he afterwards did repurchase it at such price. *Held,* in an action by the plaintiff for fraudulent representations and concealment by the defendant in regard to the value of the stock, in connection with its repurchase, that parol evidence of what was said between the parties at the time the written contract was made, was admissible for the purpose of showing such a confidential relation of the parties, as rendered fraudulent the course of the defendant in making the repurchase.

*Held,* also, that if the defendant was aware that the plaintiff placed confidence in him to inform her fully of the value of the stock, and acted in reliance upon his representations in regard to its value at the time of his repurchase of it, and if this confidence was solicited ,by him, it was fraudulent in him to purchase it of her without communicating to her all the material knowledge he possessed in regard to it.

The defendant, being desirous of purchasing certain stock of the plaintiff, of the value of which he knew she was ignorant, for the purpose of misleading her and inducing her to sell the stock at less than its value, told her of a fact calculated in itself to depreciate the value of the stock, but omitted to disclose other facts within his knowledge which would have given her correct information of such value, and by this course succeeded in obtaining the stock at much less than what it was worth. *Held,* that the course of the defendant, under the peculiar confidential relations subsisting between the parties, was fraudulent and actionable.

The allegation of only a part of the truth, with the view of deceiving the other party, and inducing him to act differently from what he otherwise would, is equivalent to a false representation, and will avoid a contract thereby induced. ALDIS, J.

A party to a contract has a right to rescind it on account of the fraud of the other party as soon as he discovers the same; but if he elect to proceed and take his rights under the contract, he may still maintain an action against the other party for the damages occasioned by his fraud.

CASE. The declaration set forth that the plaintiff was the owner of fifty shares of the capital stock of the Franklin

Mallory *v.* Leach.

Mining Company, of the true value and situation whereof she was ignorant, and had no means of accurate information, and that the defendant undertook, at her request, to ascertain and communicate to her the value of such stock; that said stock was worth thirteen hundred dollars, which the defendant ascertained, but that he, contriving and intending to defraud the plaintiff, and to obtain said stock from her at much less than its just value, did not communicate to the plaintiff or inform her of its true value or the facts in relation thereto, but fraudulently concealed and suppressed the same, and fraudulently induced the plaintiff to believe that the said stock was of much less value than it really was, and also falsely represented that the same was of much less value than it really was; and also falsely represented that the same was about to be subject to a large assessment, when in fact, and as the defendant well knew, said assessment was only two dollars upon a share; that by means thereof the defendant then and there induced the plaintiff to transfer to him (and for his benefit,) the said stock for the sum of two hundred and seventy-five dollars paid her therefor by him, being much less than its real value as aforesaid; that the plaintiff believed and relied upon said representations, and was wholly ignorant of the facts so concealed and suppressed by the defendant as aforesaid, and of the true value of said stock, and supposed that the defendant had fully communicated to her his knowledge on the subject; and that she therefore* did transfer said stock to the defendant, and for his benefit, for said last mentioned sum and no more; and that the defendant received and converted the same to his own use, and immediately sold the same for the sum of thirteen hundred dollars; and that thereby the plaintiff took the whole value of said stock over and above the sum of two hundred and seventy-five dollars, to wit: ten hundred and twenty-five dollars.

The defendant pleaded the general issue, and the cause was tried by jury at the September Term, 1860, PIERPOINT, J., presiding.

On trial the plaintiff gave evidence tending to show that in December, 1857, the defendant, who had in his hands two hundred and seventy-five dollars of the plaintiff's money, told the

Mallory *v.* Leach.

plaintiff that he owned about six hundred shares of the capital stock in the Franklin Mining Company, (a company incorporated in the state of Michigan,) which stock was guaranteed to him, and proposed to the plaintiff to appropriate the money then remaining in his hands, belonging to her, in the purchase of fifty shares of the capital stock of the company, for her benefit ; that he said the company or Messrs. Palmer would guarantee that the stock would pay twenty per cent. for two years, and at the end of that time they would take back the stock at the price paid for it, and the twenty per cent. added if the purchaser preferred to take that rather than keep the stock, and that he would give her his individual guaranty to the same effect ; and that he also told her he wanted to do something to make her independent, and he thought this would do it ; also, that he had no doubt but the stock would increase in value so as to make her independent ; and that being himself interested in the stock, he would keep the plaintiff informed as to the situation and value of the stock ; and that he should go to the mines a year from next June ; that upon the representations of the defendant, and without any knowledge of her own on the subject, the plaintiff concluded to take the stock, and soon afterwards the defendant sent for fifty shares of the stock, and obtained a certificate of the same, with the guarantee of Messrs. Palmer, as recited below, and delivered the same to the plaintiff, and thereupon executed his own written guarantee upon the back of said certificate, in the following terms :

" MEMORANDUM.

NEW YORK, Dec. 22nd, 1857.

Sold to B. N. Leach of Middletown, Vt., Certificate No. 33 of ' Franklin Mining Company,' of the state of Michigan, being certificate for fifty shares in said Franklin Mines, issued originally to Charles H. Palmer. I agree for myself and for my brother, Charles H. Palmer, to re-purchase on the first day of July, 1859, the above described shares at the rate of seven and 70-100 dollars per share (on sixty days' time) if the said Leach or the holder of this guaranty so desires.

N. G. PALMER, for himself and brother,
CHARLES H. PALMER."

" MIDDLETOWN, Dec. 29th, 1857.

I have this day sold the within described fifty shares of the Franklin Mining Company to Mrs. Cynthia S. Mallory of Middletown, Vt., and become surety to her for the faithful fulfillment of the guarantee of Charles H. & N. G. Palmer, so that in case they should fail to redeem their pledge to re-purchase, (if she so desires,) I hereby agree to take their place and to re-purchase said fifty shares of stock, at the rate therein specified, if Mrs. Mallory shall so desire.

B. N. LEACH."

The plaintiff's evidence further tended to show that the defendant requested the plaintiff to keep the transaction secret from all except her father and mother; and that the defendant paid for said fifty shares of stock $275 and the interest thereon from July 1st, 1857, and that the plaintiff gave the defendant her note for $6 to cover such interest, at the time the above recited contract was made.

The defendant's counsel objected to the admission of any parol testimony as to what was said by the parties relating to the transaction. The court admitted the evidence of what was said by the parties previous to, and at the time of, the making of the writing, as showing the situation and relation of the parties and tending to explain or give character to the subsequent acts of the parties relating to the stock in which it is alleged the fraud was committed.

It further appeared that in making the contract the plaintiff had the advice of her father, who was a man of intelligence and good business talent.

The evidence introduced by the plaintiff also tended to show that on the 30th of June, 1859, the defendant and the plaintiff's father met, and the defendant inquired of the plaintiff's father if he knew whether the plaintiff had decided whether to keep the stock or re-convey it to him, according to the terms of the contract, and in the course of the conversation the defendant said that he expected there was to be a large assessment on the stock that fall, and that he should have to pay about $1100 on his stock; that in this conversation the defendant did not tell the plaintiff's father any thing about the real value of the stock, or

say any thing calculated to put them on inquiry; that the plaintiff's father said that he supposed that the plaintiff would elect to re-convey the stock; that on the morning of the 1st of July, 1859, the plaintiff sent word by her father to the defendant that she had concluded to have him take back the stock; that in the afternoon of the same day the defendant called upon the plaintiff, and the plaintiff then informed the defendant that she had concluded to have him take back the stock according to the contract; that the plaintiff made no inquiries of the defendant about the value or condition of the stock, and knew nothing of its value except what the defendant had said about an assessment upon the stock; that the defendant then paid the plaintiff $94.50, in money, and gave her his note for $290.50, by consent of the plaintiff, payable in six months, which note has since been paid, making the sum of $7.70 per share on said stock, amounting in the aggregate to $385.00.

The plaintiff also gave evidence tending to prove that at the time of the re-transfer of the stock, and of the defendant's conversation with the plaintiff's father in relation to it, the stock was worth in market about $1300; that the defendant was aware of it, and intentionally concealed it from the plaintiff; that the plaintiff did not know any thing about its value, but relied on the previous undertaking of the defendant to inform her in relation to it.

It further appeared that the defendant at the time he took the conveyance of the stock from the plaintiff, knew that it was quoted in the public newspapers at $22.00 per share, but had no other information than what he derived from the newspapers, that such quotation was correct, and the defendant supposed it to be so, and that he said nothing to the plaintiff about the value of the stock. It further appeared that the plaintiff learned of the true value of the stock about two weeks after she re-conveyed the same to the defendant, but that she did not thereafterwards express any dissatisfaction to the defendant personally, nor offer to rescind her contract of re-conveyance; and that when the defendant's note of $290.50 matured, she received payment of the same without objection, but had no personal communication with him in relation to the matter.

The defendant introduced testimony on his part tending to show that in the course of his conversation with the plaintiff previous to the making of the written contract above recited, he incidentally expressed his intention of going to the mines a year from the next June, and that if the stock did not turn out as well as he had anticipated, he would inform her, and that he gave her no other or further assurance either as to going to the mines, or keeping her informed as to the situation and value of the stock; that soon after the contract was made, the plaintiff, by reason of improper influences from third persons, became alienated toward the defendant, and lost confidence in him; that the plaintiff never afterwards enquired of the defendant about the value or condition of the stock, and did not, at the time she transferred the stock to the defendant, make any inquiries about its value; that the defendant had never been to the mines, and that in all the representations made by him before and at the time of the contract, and in the procuring of said stock for the plaintiff, the defendant acted in entire good faith, and that there were good and satisfactory reasons, as both parties understood at the time, for keeping the transaction secret; that he knew the value of the stock at the time of the re-conveyance; that he did not inform the plaintiff, and had no reason to suppose she knew it; that when he informed the plaintiff's father about the proposed assessment, he had been informed and believed that there was to be an assessment upon the capital stock of the company, and that in point of fact an assessment of two dollars on the share was made soon after the re-conveyance of the stock by the plaintiff to the defendant, and that the assessment on the defendant's original stock amounted to twelve hundred dollars; that he did not allude to the subject matter of an assessment upon the stock, until after the plaintiff's father had informed him that the plaintiff would probably elect to re-convey the stock to the defendant; that he had no other information about the value of the stock at the time of the re-conveyance of the same to him by the plaintiff than the stock quotations contained in the public newspapers, and that about forty of these papers were taken and distributed in the town of Middletown, where the plaintiff resided; but it did not appear that either the plaintiff or her

father took or even saw any of those papers. The plaintiff testified that she did not, and also that about four months after the plaintiff purchased said stock of the defendant, he advised her to hold on to it, as he thought it would make her independent.

After the close of the evidence, the defendant's counsel claimed, and requested the court to charge the jury:

1. That the evidence in relation to the contract varied from the allegations in the declaration, and that therefore the plaintiff could not recover:

2. That the contract in writing controlled the transaction, and that no obligation existed upon the part of the defendant beyond what was contained in the written contract, or imposed by it. And that if the plaintiff elected to re-convey the stock and receive the premium provided by the contract, no fraud could be imputed to the defendant:

3. That in order to create a liability on the part of the defendant, it was incumbent upon the plaintiff to make out that the defendant was guilty of some fraud by means of which the plaintiff was induced to re-convey to him the stock. And that as it was conceded that the defendant made no representations, either before or at the time of said transfer, that were not in point of fact true, no recovery could be had for false representations. And that a mere failure on his part to disclose any knowledge or belief that he might have had of the value of the stock, could not amount to a fraud for which a recovery could be had, if no inquiries were made of him for information.

4. That the defendant being under obligation to take the stock at the price specified in the contract, if the plaintiff so elected, and she having so elected without making any inquiries of the defendant as to its value, no fraud could be imputed to the defendant growing out of the voluntary performance on his part of a contract she has the right to enforce.

5. That fraud can not be predicated upon representations that were true; and that if the defendant represented that an assessment was to be made upon the stock, and the assessment was actually made as represented, no recovery could be had by reason of such representation.

6. That if the plaintiff, after having ascertained the real

value of the stock, failed to repudiate the contract of re-conveyance, but retained the note that the defendant gave her, without offering to rescind, and finally received her pay upon said note without objection, at or about the time it matured, it would constitute a ratification of the contract of re-conveyance, and a waiver of any supposed claim she might have had, even if the transaction were in itself fraudulent.

The court declined to charge as requested, but charged the jury in substance, and among other things not objected to, as follows :

That the rule of law is not settled that the vendee of property is bound to communicate all the knowledge he possesses as to the character and condition or value of the property he purchases ; but that he is bound not to make any false representations as to the property, to induce the owner to sell it for less than he knows it to be worth ;

That if there was nothing between the parties to this suit except that the defendant proposed to re-purchase the stock, he would not be under obligation to give the plaintiff any information as to the value of the stock ; and that if the defendant took back the stock on the original agreement between the parties, he at the time knowing what the market price was, still he was not bound to make that market price known to the plaintiff, but if the defendant said anything with a view to mislead the plaintiff as to the value of the stock, and induce her to sell the stock at a price less than its value, and she relied thereon and was deceived thereby, he would be liable in this action, unless he disclosed all his knowledge of its value ; that if he told her facts calculated to depreciate its value, he must also communicate all the facts within his knowledge tending to enhance its value :

That if the defendant, with a view to induce the plaintiff to sell him the stock, represented that a large assessment was to be made upon said stock, he at the same time knowing the stock to be worth much more than he was to pay for it, he was bound to communicate to the plaintiff such information as he possessed in relation to the value of the stock, although the representation he did make was in point of fact true ; that if the defendant said what was true, and at the same time knew that the market value

of the stock was much more than he was to pay, he would be liable in this action if he did not tell the whole truth; that a man may commit a fraud in telling the truth, if in stating the truth he intends to deceive another, and states it in such a manner as to deceive that other; and that this depended upon the intent with which the communication was made:

That, as by the evidence in this case it was no part of the original agreement or contract that the defendant was to give the plaintiff any information in relation to the stock, no obligation existed by virtue of the written contract to impart such information; but that if, at the time the written contract was made, the defendant told the plaintiff that he would inform her of the situation and value of the stock from time to time, and the plaintiff relied upon such promises, and the defendant obtained information relating thereto, he would be bound to communicate that information to her before he purchased back the stock, especially when the circumstances were such that he supposed she was acting in ignorance of it, because he had placed himself in such a relation that it would be a fraud if he received back the stock without giving her the knowledge he possessed; that the defendant should not have suffered the plaintiff to mislead herself by so conveying the stock to him under such circumstances that the inference would be irresistible that she would not have sold the stock for three hundred and eighty-five dollars, when it was worth nearly twelve hundred dollars; that if the defendant did agree to give her such information, and had reason to believe that the plaintiff did not know what the real value of the stock was, he was bound to communicate it; that in determining whether fraud was committed or not, the jury were to find whether the defendant did agree to give information as to the condition of the stock; and if the defendant did so agree and had information and failed to communicate it, it was such a fraud, under the circumstances of the case, as would entitle the plaintiff to recover; that an incidental remark that the defendant was going to the mines, and that if the stock did not turn out well he would inform her, &c., as stated in the defendant's testimony, would not be sufficient to make the defendant liable.

To the admission of the evidence objected to, to the refusal of the court to charge as requested, and to the charge of the court as made, the defendant excepted.

*D. Roberts, E. N. Briggs* and *D. E. Nicholson*, for the defendant.

*Linsley & Prout* and *E. J. Phelps*, for the plaintiff.

ALDIS, J.  I.  As to the alleged variance, it may be observed that it consists in averring the injury occasioned by the plaintiff's fraud to be greater than it was proved to be.  But in the averment of damages it is not necessary to be exact; and the proof need not sustain the allegations in this respect.

II.  The parol evidence was admissible as tending to show the fraud—not as qualifying the written contract.  It tended to show a special confidence and relation between the parties, in regard to this business, and, if proved, to the satisfaction of the jury, to have existed in the outset, and to have continued to the time of the re-purchase by the defendant, must materially have given character to both the defendant's words and silence, as intended to induce the plaintiff to act under a delusion.  This leads us to the main point, viz.: the testimony on the part of the plaintiff, and the charge of the court in regard to it.

The testimony of the plaintiff tended to show, that the defendant, in advising her to buy the fifty shares of mining stock, professed to act as her friend, from a desire to invest her money so as to make her independent, and in a mode that was to be kept secret from all but her father and mother, and with his own guarantee that she should get back her money and at least twenty per cent. interest.  He told her that as he was interested in the stock he would keep her informed as to its situation and value, and that he should go to the mines in June, 1859.  This declaration of the defendant is to be considered in connection with the fact that by the written contract she was to decide on the 1st July, 1859, to keep or to sell her stock.  That such language would strongly tend to beget confidence and trust in the defendant, and lead the plaintiff to rely upon his advice, and to be

guided by it on his expected return from the mines in June, 1859,. is obvious. This must have been the purpose for which he thus advised her; and we think he must have been aware of the effect that it produced on her mind at that time. Now if this relation of trust and confidence continued from December, 1857, when she bought the stock, to July, 1859, when she sold it to the defendant, and he at the time of his purchase knew that she thus trusted in and relied upon his friendship and advice in this matter, it was clearly his duty to tell her of its real value, and it was a fraud to take advantage of her ignorance and buy it at about a quarter of its market price. But if during this period of time this relation of confidence ceased to exist, and alienation and distrust had taken its place, then it is obvious that he could not have supposed she was relying upon his friendship and advice in this business, and was not under obligation to give her information in regard to the value of her stock.

There was testimony on the part of the defendant tending to establish this state of facts. The fraud of the defendant (if any) consisted in taking advantage of the confidence which he knew the plaintiff put in him, and which he had sought to win; but if she had lost her confidence in him, he could no longer take advantage of it.

The court distinctly stated to the jury that no obligation rested upon the defendant by virtue of *the contract* to inform her of the real value of the stock. To have required that would have been to add a new clause to the contract. The court then proceeded to refer to those circumstances which gave rise to a relation of trust and confidence between the parties in this matter, and made it the duty of the defendant to inform her of what he knew as to the value of the stock, and then said to the jury, " because he had placed himself in such a relation it would be a fraud in him to receive back the stock without giving her the knowledge he possessed." This put the case clearly on the ground of fraud in taking advantage of a confidence he had sought, and which he knew was placed in him.

The doubt we have felt, in regard to the correctness of the charge in this respect, is whether the court sufficiently called the attention of the jury to the fact that this relation of confidence

must exist between the parties at the time of the re-purchase by the defendant, and to those circumstances shown on the part of the defendant tending to prove that the relation had ceased to exist. We have carefully examined the exceptions on this point, and can not but regret that the statement in this respect is not more satisfactory. It does not appear that the defendant in his requests to the court called their attention to this part of the defence, or made any request in regard to it. The defendant's evidence was admitted. The court treated the promise of the defendant to inform her of the situation and value of the stock from time to time as a continuing promise, and seem to carry the idea that the plaintiff must have continued to rely on it. As there is no direct request to charge in regard to this part of the defence, and as no exception was taken on the ground of an omission in this respect; and as it would have been the duty of the defendant to have called the attention of the court to this point, if not sufficiently referred to in the charge, and as the general tenor of the charge seems to require that the confidence should have existed at the time of the re-sale, we think we should not be justified in opening the case on this ground.

The defendant further claims that the charge of the court in regard to the representation made by the defendant, that there was about to be a large assessment made upon the stock, was incorrect. The substance of the charge is,—if the defendant said this with a view to mislead the plaintiff as to the value of the stock—if the fact was calculated to depreciate its value and to induce her to sell at a price less than the value, and she was thereby deceived and induced to sell, he would be liable unless he disclosed his knowledge of facts tending to enhance its value.

1. This does not assume as matter of law, that the fact would depreciate its value and induce her to sell. That question is left to the jury. It is obvious that ordinarily an assessment of 25 per cent. upon stock, unexplained, would lead the holder to suspect something might be wrong; especially if it was not expected by stockholders that such an additional payment was to be made. So if the holder of the stock was a poor person, and unable without trouble and inconvenience to raise the sum assessed, it

would tend to induce such person to sell the stock. We think the evidence admissible as tending to show that the defendant made declarations which he must have been aware would embarrass the plaintiff and lead her to wish to part with her stock.

It was telling the truth, but not the whole truth. It was telling it in a manner to produce the effect of a falsehood. The defendant must have felt that what he said would depress the plaintiff's estimate of her stock—would lead her to think its value much less than it was; and he knew she was ignorant of its true value. Now he might be silent—might say nothing; but he had no right to produce a delusion by his language, and knowingly take advantage of it for his own benefit. This was not fair dealing, and was very properly characterized in the charge of the court.

III. It is further claimed that the receipt by the plaintiff of the amount of the note given for the stock, after she knew of the fraud, was a ratification of the contract, so that she can not now sue for the deceit.

Let us consider what the rights of the parties were when the defendant had by fraud procured a transfer of the stock to himself.

1. As to the defendant it is obvious that he could not take advantage of his own wrong—he could not rescind the contract, but was bound by it to pay the note.

2. As to the plaintiff, as fraud avoided the contract, she had the right, if she saw fit, upon discovery of the fraud, to treat the contract as wholly at an end—to return to the defendant his note and demand a re-conveyance of the stock. This would have been to rescind or disaffirm the contract. If she thought that the stock would continue to advance in value and remain a highly profitable investment, she might have deemed it for her interest to have back the stock; and, in order to accomplish this, she should have given notice immediately to the defendant that she disaffirmed the contract and demanded back her stock. But she was not bound to do this. She might claim what was due her by contract, and also rely upon her right to recover her damages for the amount of which she had been defrauded—which would be the difference between what the defendant had

agreed to pay her for the stock and its true value. In such case she would have ratified the contract, but would not have thereby waived her claim to damages.

The fallacy of the defendant's claim is this: that it supposes a ratification of the contract to be a waiver of the right to recover damages. Not at all. The plaintiff has the right to hold the defendant to his contract, and, also, to recover of him compensation for the injury occasioned by his fraud. How can the defendant complain of this? It is but making the plaintiff good. It can not injure the defendant, or deprive him of any defence, or impair any right.

If the plaintiff had seen fit to rescind the contract, but had waited an unreasonable time before giving notice,—pondering upon the fluctuations and chances of the market before·making a decision—the defendant might perhaps say with justice that such delay tended to deprive him of his reasonable opportunity to sell, and that he might well suppose she had concluded to ratify the sale and ask not for her stock, but only for damages. Her right to her damages was perfect when the fraud was committed. It is a right not legally to be extinguished but by compensation or by voluntary release. To infer a release of the damage from her receiving payment of the note would be putting an unreasonable construction on the act. She thereby takes what the defendant agreed to pay, and neither claims nor relinquishes her rights growing out of the fraud.

The case cited by the defendant from 9 B. & C. 57 only shows that though the vendor of goods sold through fraud and upon a credit might sue in trover for the goods before the credit expires, yet if he proceed upon the *contract* of sale he can not sue till the credit has expired. The principle of that case does not conflict with the plaintiff's right to recover his damages after receiving payment of the note. When he sues upon the contract he must be bound by it, but when damage results from the fraud beyond what he can recover by contract, he can also recover in an action on the case for the deceit.

In 2 Pars. on Contracts 278, in a note, it is said, " If a party defrauded brings an action on the contract to enforce it, he thereby waives the frauds and affirms the contract." The

authorities cited to sustain this are 5 M. & W. 83, and 24 Wendell 74.

In *Selway* v. *Fogg*, 5 M. & W. 83, the action was assumpsit for work in carting away rubbish. The plaintiff, induced by the fraudulent representations of the defendant as to the depth of the rubbish, agreed to do the work for £15, which had been paid him. He sought by this action to recover for the value of his work above the £15. It appeared that the plaintiff had knowledge of the circumstances indicative of the fraud before the work was finished. Upon the trial, ABINGER, C. B., was of the opinion, that the question of fraud was not open to the plaintiff in the present action, although it might be the subject of complaint in another. Upon hearing in the Exchequer, ABINGER, C. B., said "a party can not be bound by an implied contract when he has made a specific contract which is avoided by fraud. If he repudiate the contract on the ground of fraud, as he may do, he has a remedy by an action for deceit." So far the opinion stands upon solid ground, and was required for the decision of the case. But when the Chief Baron proceeds to say "secondly, the plaintiff had full knowledge of all that constituted the fraud, during the work, and as soon as he knew it he should have discontinued the work and repudiated the contract, or he must be bound by its terms," if he means, that the plaintiff could not in such case recover for the damage he suffered from the fraud in an action for the deceit, he says what was not required for the decision, and what we deem untenable as a rule of law. Consider in what a position the plaintiff is put by the application of such a rule. He proceeds with his work till it is in part done, and then discovers "circumstances indicative of fraud." He may be fully convinced that he has been defrauded, and yet feel great doubt that he can prove it. He says to himself, "If I proceed and finish the work I shall be entitled in any event to the contract price. If I stop and fail to prove fraud, I can not recover for the work I have done. If I proceed and finish the work and still shall be able to prove fraud, why should I not be entitled to recover the full value of all my work ; why should I be bound to a contract price to which my consent was procured through fraud? How does my going on with the work

Mallory *v.* Leach.

injure the defendant, or purge his fraud? If he has been guilty of fraud he knows it, and needs no notice from me to put him on restitution." If, however, the going on with the contract injures the defendant's rights, or puts him in a worse condition than he would be by rescission, then the plaintiff ought not to go on, but to stop and give notice. But the defendant can not justly claim it as his right, not to have the work done at all unless he can have the advantage of his fraud, and get it done for less than its fair value. When he agreed to have the whole work done, and decided to try to get it done for less than its value through fraud, he should have considered that the plaintiff might not discover the fraud till the whole work was done; or might, if he did discover it, doubt his ability to prove it, and so reasonably go on and finish the work; and yet, in either case, it would be flagrant fraud in him to pay only the contract price.

The *S. & S. R. R. Co.* v. *Row*, 24 Wend. 73, was where the defendant, before commencing the work, knew of the alleged fraud, and had all the knowledge as to the fact said to be misrepresented that the plaintiff had, and could not have relied on such representation. The court say, " if the truth had not been discovered till after the performance of the contract had been commenced, a different question would have been presented.

In *Kimball* v. *Cunningham*, 4 Mass. 502, the question was whether the defrauded party, who had affirmed the contract, could retain in his possession personal property, a part of the consideration, which by the contract was to pass to the other. *Held* that the contract, if affirmed, was affirmed as a whole, and that the defendant was liable in trover for the property so withheld. It also appeared in the case that the defendant had sued for his damages from the fraud in an action on the case. The court say, by this action it is clear he has made his election to consider the contract as subsisting, *and to recover damages for the breach of it.*

If so, the fraud was not waived in the sense of waiving the right to recover damages for it.

In *Campbell* v. *Fleming*, 1 Ad. & El. 40, the plaintiff sought in an action of assumpsit to recover the price he had paid for shares in a mining company which he had been induced to buy

by fraudulent representations. After knowledge of the fraud he consolidated the shares with other property in a new company, and had sold shares in the new company. *Held*, that such sales of the new shares, after knowledge of the fraud, was an affirmance of the contract, so that he could not sue for and recover back his purchase money. The decision does not touch the point that he could not recover, in an action for the deceit, the damages he suffered by it.

The whole subject is well considered in *Whitney* v. *Allaire*, 4 Denio 554; and the court say: "There is no principle or authority showing that where a person has been defrauded by another in making an executory contract, a subsequent performance of it on his part, even with knowledge of the fraud, acquired subsequent to the making and previous to the performance, bars him of any remedy for his damages for the fraud. The party defrauded, by performing his part of the contract with knowledge of the fraud, is deemed to have ratified it, and is precluded thereby from subsequently disaffirming it. That is the extent of the rule. His right of action for the fraud remains unaffected by such performance. But having gone on after discovering the fraud, he can not afterwards disaffirm the bargain, or sue for the consideration." The principle and its reason apply to this case. Upon this subject see Long on Sales, 219, 240; 2 Kent's Com. 480; 3 Fost. 520; 10 Ind. 430; the remarks of SHERMAN, J., in 14 Conn. 424–5; 5 McLean 170; 9 Cush. 266.

Judgment affirmed.